**In the**
**UNITED STATES DISTRICT COURT**
**for the SOUTHERN DISTRICT OF INDIANA,**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **KATHY S. GRANT**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs*. | )   **CAUSE NO. 1:08-cv-784-SEB-TAB** |
| | ) |
| **MICHAEL J. ASTRUE**, Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

**E N T R Y**

The Commissioner of Social Security denied Kathy S. Grant's application for disability

benefits under the Social Security Act.  She now seeks judicial review of that denial.  For the

reasons set forth herein, we reverse the Commissioner's decision and remand her application for

reconsideration.


**Standards and procedures.**

Our review of the Commissioner's factual findings is deferential:  we must affirm if they

are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*,

390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.

*Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a

reasonable person to conclude that it adequately supports the Commissioner's decision, then it is

substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842

(1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial

1

review derives from the principle that Congress has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.  Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While review of the Commissioner's factual findings is deferential, his legal conclusions are reviewed *de novo*.  *Richardson*, *supra*.

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months".  42 U.S.C. §§ 416(I) and 423(d)(1)(A).  A person will be determined to be disabled only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The combined effect of all of a claimant's impairments shall be considered throughout the disability determination process.  42 USC § 423(d)(2)(B).

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 C.F.R. § 404.1520.  If disability status can be determined at any step in the sequence, an application will not be reviewed further.  *Id.*  At the first step, if the claimant is currently

engaged in substantial gainful activity, then he is not disabled.  At the second step, if the

claimant's impairments are not severe, then he is not disabled.  A severe impairment is one that

"significantly limits [a claimant's] physical or mental ability to do basic work activities."  20

C.F.R. § 404.1520(c).  Third, if the claimant's impairments, either singly or in combination,

meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20

C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled.  The Listing of

Impairments are medical conditions defined by criteria that the SSA has pre-determined are

disabling.  20 C.F.R. § 404.1525.  If the claimant's impairments do not satisfy a Listing, then his

residual functional capacity ("RFC") will be determined for the purposes of the next two steps.

RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-

related physical and mental limitations.  20 C.F.R. § 404.1545.  At the fourth step, if the claimant

has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the

claimant's age, work experience, and education (which are not considered at step four), and his

RFC, he will not be determined to be disabled if he can perform any other work in the relevant

economy.

       The burden rests on the claimant to establish steps one through four.  The burden then

shifts to the Commissioner at step five to establish that there are jobs that the claimant can

perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If a

claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404,

Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability

determination.  The grids are tables that correlate a claimant's age, work experience, education,

and RFC with predetermined findings of disabled or not-disabled.  20 C.F.R. §§ 404.1569 and

1569a.  If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the claimant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may still be used as an advisory guideline in such cases.  20 C.F.R. § 404.1569.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner and a physician or other medical specialist.  If the application is denied, the claimant may request reconsideration review, which is conducted by different disability and medical experts.  If denied again, the claimant may request a hearing before an administrative law judge ("ALJ").[1]  A claimant who is dissatisfied with the decision of the ALJ may request the national Appeals Council to review the decision.  If the Appeals Council either declines to review or affirms the decision, then the claimant may file an action in district court for judicial review.  42 U.S.C. § 405(g).  If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

**Administrative record summary.**

In December 2003, Ms. Grant filed her current application for benefits under the

---

[1] Initial and reconsideration reviews in Indiana are performed by an agency of the state government — the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration — under arrangement with the Social Security Administration.  20 C.F.R. Part 404, Subpart Q (§ 404.1601 *et seq.*).  Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

Disability Insurance Benefits program ("DIB"), alleging that she became disabled on May 30, 2002.  (R. 64).[2]  On an earlier application, she had been found disabled beginning in August 1990, but a periodic review of her continued eligibility found that her disability had ceased as of July 26, 2000.  (R. 23).  Ms. Grant did not prosecute an appeal of that decision and does not dispute that it is now a final determination.  She also does not dispute that her insured status for DIB benefits expired on March 31, 2005.  (R. 24, 58).  Therefore, the issue before the Commissioner was whether Ms. Grant was disabled between May 30, 2002, her alleged onset date, and March 31, 2005, when her eligibility expired.  Her application was denied on initial, (R. 51-55), and on reconsideration review, (R. 47-49), and a hearing before an ALJ was held on September 6, 2006, (R. 740).  The ALJ issued his denial decision on March 17, 2007, (R. 20, 23), and the Appeals Council denied Ms. Grant's request to review the  ALJ's decision on April 16, 2008, (R. 4).

Ms. Grant was 48 years old on her date last insured.  She was six credits shy of graduating college.  Her most recent work has been full-time as a news-editor and journalist, and part-time as a columnist.  In her application, she claimed to have the impairments of bipolar disorder, generalized anxiety disorder, asthma, arthritis, tendinitis of the feet, Crohn's disease in remission, and hypothyroidism and claimed that these conditions disabled her from work due to periodic depression/hypomania, anxiety, joint and foot pain, and shortness of breath.  (R. 105).

---

[2] Two types of disability benefits are available under the Social Security Act:  Disability Insurance Benefits ("DIB") for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 423, *et seq.*, and Supplemental Security Income benefits ("SSI") for uninsured individuals who meet certain income and resources criteria, 42 U.S.C. § 1381, *et seq.*

She also claimed to have tarsal tunnel syndrome of the feet and plantar fasciitis, (R. 91, 779), fibromyalgia, (R. 67), and chronic obstructive pulmonary disease ("COPD"), (R. 743).  At the hearing, Ms. Grant testified that her COPD and bipolar disorder were her most serious problems that prevented her from working.  (R. 769).

**Physical examination, Dr. Majid, January 2004.**  Dr. Majid, of Greenwood Pediatrics and Internal Medicine, conducted a consultative physical examination of Ms. Grant.  (R. 222). He found no clinical objective evidence that would impair her sitting, lifting, carrying, or handling, and found no impairment of seeing, hearing, speaking, or traveling.   He found that she "has limitation to standing, walking" but could work 2 to 4 hours a day.  The ALJ interpreted this to mean that Ms. Grant could stand and walk for only two to four hours a day.  (R. 28).  Dr. Majid concluded that Ms. Grant has "more subjective, than physical and psychological issues" and she would need a psychological and/or psychiatric evaluation.  Her "overall outcome would be guarded."  (R. 224).

**Psychological examination, Dr. O'Brien, February 2004.**  Dr. O'Brien, of O'Brien Psychological Services, performed a mental status examination and review of records.  He expressed his diagnoses according to the standard multi-axial system:[3]

> Axis I (clinical disorders and other conditions that might be a focus of clinical attention):
>      296.62:  Bipolar I Disorder, Recent Episode Mixed, Moderate.
>      300.02:  Generalized Anxiety Disorder.
>
> Axis II (personality disorders and mental retardation):  Deferred.

---

[3] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision ("*DSM-IV-TR*"), p. 27 (2000).

Axis III (general medical conditions):  Defer to medical records.

Axis IV (psychosocial and environmental problems):  Financial Pressures.

Axis V (Global Assessment of Functioning rating):  60.

(R. 212).

**State-agency initial review, March 10, 2004.**  On initial review of Ms. Grant's application papers and record evidence at the time, the state-agency reviewers recorded a primary diagnosis of Affective Disorders and a secondary diagnosis of Anxiety Related Disorders and they concluded that she was not disabled.  (R. 41).  The reviewing state-agency physician completed a Physical Residual Functional Capacity Assessment.  (R. 214). Exertionally, he found that Ms. Grant had the RFC for medium work.  (R. 215).  Posturally, he found that she was restricted to only occasionally climbing, balancing, and crouching, but that she could frequently stoop, kneel, and crawl.  (R. 216).  He found no manipulative, visual, communicative, or environmental limitations.  (R. 217-19).

**Psychiatric examination, Dr. Briones-Ramilo, March 25, 2004.**  In December 2003, Ms. Grant began treatment at the Cummins Mental Health Center.  Treatment records continue into July 2006.  Dr. Briones-Ramilo performed an initial mental status examination in March 2004 and gave the following diagnoses:

Axis I (clinical disorders and other conditions that might be a focus of clinical attention): 296.89:  Bipolar Disorder. 300.3:  Obsessive Compulsive Disorder.

Axis II (personality disorders and mental retardation):  deferred.

Axis III (general medical conditions):  hypothyroidism and asthma.

Axis IV (psychosocial and environmental problems):  financial problems.

Axis V (Global Assessment of Functioning rating):  current 60, highest past year 65.

(R. 185).  Ms. Grant had the same Axis I diagnoses and GAF ratings in December 2004.  (R. 660).

**State-agency reconsideration review, May 18 and 20, 2004.**  A different state-agency disability examiner, physician, and mental consultant[4] conducted a reconsideration review of Ms. Grant's application with the additional submitted evidence.  The diagnoses and conclusion were the same as found on initial review, (R. 40), as was the Physical Residual Functional Capacity Assessment, (R. 221 (affirming the form completed on initial review)).

**State-agency mental consultant's opinion, Dr. Neville, May 20, 2004.**  Dr. Neville, Ph.D., a medical consultant with the state agency, reviewed the Record as it existed at the time and, on May 20, 2004, completed a Mental Residual Functional Capacity Assessment ("MRFC"), (R. 190), and a Psychiatric Review Technique form ("PRT"), (R. 194), by which he gave his opinions on Ms. Grant's mental impairments and resulting functional limitations.  The first part of the MRFC is a check-box form which asks the reviewer to rate a claimant's capacity to sustain twenty mental activities under four broad categories:  (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.  The reviewer is asked to rate a claimant's capacity by selecting one of five points along a continuum: (1) not significantly limited, (2) moderately limited, (3) markedly limited, (4) no evidence of limitation in this category, and (5) not ratable on available evidence.  Dr. Neville rated Ms. Grant

---

[4] The mental consultant was Dr. Neville, whose opinion is discussed *infra*.

8

as "not significantly limited" in sixteen of the twenty activities and "moderately limited" in the other four.[5]  The last section of this form is the "Functional Capacity Assessment," which asks for a narrative elaboration of the check-box ratings.  Dr Neville wrote:

> Clmt is Bipolar & has anxiety.  She does loose [*sic*] her temper when manic, even with family.  She gets anxious over her family getting hurt & government not doing things the way she feels is correct.  She stopped abusing cannabis & alcohol 5 yrs ago.  She enjoys being around family but is not social outside her home.  However, she will grocery shop & run errands.  She completes basic adls [activities of daily living] & bathes/changes clothes daily.  She reads & watches tv for hours each day.  Until recently she was writing for a newspaper & was doing computer research for it.  Clmt [has?] shown she has the ability to concentrate, complete tasks & do basic adls without problem.  She does have problems socially, yet she can complete short, simple, repetitive tasks.  She will work better in an isolated work environment, but she can function in public.

(R. 192).

The PRT form is another check-box form keyed to the Listings-of-Impairments criteria for mental disorders.  The first part is divided into the nine categories of mental disorders and asks whether the required criteria for the existence of each disorder are present.  Dr. Neville evaluated Ms. Grant's mental impairments under Listing 12.04, Affective Disorders (for her bipolar disorder), and Listing 12.06, Anxiety-Related Disorders.  (R. 194).  For each of the two Listings, Dr. Neville did not select any of the existence criteria; he only checked the box reading

---

[5] Under the category of Sustained Concentration and Persistence, Dr. Neville rated Ms. Grant as moderately limited in the activities of "[t]he ability to work in coordination with or proximity to others without being distracted by them" and "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," (R. 190, 191).  Under the category of Social Interaction, he rated her as moderately limited in the activities of "[t]he ability to accept instructions and respond appropriately to criticism from supervisors" and "[t]he ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes."  (R. 191).  She was not significantly limited in any of the activities of categories Understanding and Memory or Adaptation.

"A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above." (R. 197, 199). The second part of the PRT asks the reviewer to rate a claimant's limitations in four functions on a five-point scale: none, mild, moderate, marked, and extreme. Dr. Neville selected "none" for the functions of "Restrictions of Activities of Daily Living" and "Difficulties in Maintaining Concentration, Persistence, or Pace;" he rated her as "moderate" in "Difficulties in Maintaining Social Functioning;" and he marked no box for "Episodes of Decompensation, Each of Extended Duration."[6] (R. 204). Asked to provide elaboration for his ratings, Dr. Neville merely referred to his MRFC form. (R. 206).

**Pulmonary examinations, Dr. Kawak, August and September 2004, October 2005.**

Dr. Kawak examined Ms. Grant for her complaints of shortness of breath and dry cough. He found moderate COPD with no asthmatic component. (R. 534-35, 611). He recommended that she stop smoking and he prescribed medications. Bronchodilaters were ineffective. Pulmonary tests performed in September 2004 were interpreted as showing reduced diffusing capacity, moderate airway obstruction, and overinflation which are characteristic of emphysema. (R. 618-25). The conclusion was moderate obstructive airways disease – emphysematous type, which was consistent with the referral diagnosis of emphysema with COPD. Results of the tests repeated in October 2005 were interpreted as showing moderate obstructive airways disease and moderately severe diffusion effect, which were consistent with the referral diagnosis of emphysema with COPD. (R. 613-17).

---

[6] For this function, the possible ratings were none, one or two, three, and four or more. (R. 204). All four functions also had an "insufficient evidence" box. With none of the five possible boxes checked, Dr. Neville's opinion is unclear for this function.

10

**Neurologic examination, Dr. Vivio, December 2004.**  Dr. Vivio, the Josephson Wallack Munshower Neurology group, performed a consultative examination on request of Ms. Grant's physician.  (R. 540 (first page, out-of-order), 537-39).  She diagnosed a slightly positive Romberg test and an otherwise normal examination.  She wrote:  "I think a lot of her memory issues are probably due to her anxiety and/or depression."  (R. 539).  Because Ms. Grant was concerned about her language difficulties, Dr. Vivio ordered a formal neuropsych test and an EEG to check for slowing in her brain's left hemisphere.  She also ordered balance testing for further evaluation of Ms. Grant's complaints of dizziness, decreased balance, and falls, and her slightly positive Romberg.  An electroencephalogram (EEG) and an electronystagmogram (ENG) performed in January 2004 were normal and essentially unremarkable, respectively.  (R. 593, 594).

**Medical-expert testimony, Dr. Stump, September 2006 hearing.**  Dr. Loyd Stump, an internist, testified at the ALJ's hearing as a medical expert, giving his opinion after reviewing the evidence.  He testified that Ms. Grant's cardiac and pulmonary conditions do not meet the Listings but her COPD and obesity would probably limit her to sedentary work.  (R. 801).  He indicated that he didn't "find anything regarding her feet, or her hands."  (R. 802).  It is unclear whether he meant anything of Listing-level or lesser severity, but he did not find any reason other than her obesity and COPD that limited her to sedentary work.  (R. 803).  He testified that "these people cannot do bending, crawling, and kneeling . . . anything that has to do with bending over makes shortness of breath worse."  (R. 804).

**Vocational expert testimony, Ms. Archer, September 2006 hearing.**  Stephanie

11

Archer testified as a vocational expert at the ALJ's hearing.  She testified that, while Ms. Grant's past work was in journalism, "I don't even think there is any past relevant work . . . [b]ecause of the time."  (R. 806).  Of Ms. Grant's past jobs as radio news director, radio disk jockey, newspaper editor, newspaper reporter, and newspaper feature writer, only the reporter job was performed at the light level; the others were skilled sedentary jobs.  (R. 807).  She affirmed that Ms. Grant has education or skills that would allow her to directly enter skilled work.  (*Id.*)  Ms. Archer testified that, of Ms. Grant's previous jobs, only her journalist position was skilled; the rest — the majority of her jobs — were semi-skilled.

In his first hypothetical, the ALJ asked Ms. Archer about the jobs that are available for a person (1) with Ms. Grant's vocational factors (age, education, and work experience); (2) limited to no more than occasional bending, squatting, kneeling, stooping, and crawling; and (3) required to use oxygen during the entire workday.  Ms. Archer responded that the use of oxygen would not prevent her from doing the sedentary work that she did in the past, (R. 808); the only skilled and semi-skilled jobs that are appropriate for her are ones in office-type environments, of which there are over 32,000 in Indiana, (*id.*); and there are an additional 2,400 unskilled sedentary jobs in Indiana that she could perform, (R. 809).

The ALJ asked about the effect on the number of available jobs of adding various limitations to the hypothetical.  Ms. Archer responded that (1) having no more than superficial interaction with the general public, co-workers, or supervisors, would have no effect, (R. 809); (2) missing twenty unscheduled days a year, in various distributions, would not be tolerated, (*id.*); and (3) missing no more than two unscheduled days a month would be tolerated in a skilled

12

(journalist) job, but not in the semi-skilled or unskilled jobs, (R. 809-10).

**ALJ's decision.**

Following the five-step sequential evaluation process, the ALJ found, at step one, that Ms. Grant had not performed substantial gainful activity ("SGA") since her alleged onset date. (R. 26, 36).  Her occasional work writing articles and conducting research for an Illinois newspaper in 2003 and 2004 was not enough to qualify as SGA.

At step two, he found that Ms. Grant had the severe impairments of (1) heart disease, (2) COPD, (3) obesity, (4) bipolar disorder, and (5) anxiety disorder.  (R. 26, 36).  He found that she did not have a severe organic mental disorder.  He found that the objective medical evidence of record did not establish the presence of any other severe physical impairments lasting or expected to last for at least twelve months.  He therefore rejected her alleged foot problems, muscle and joint pain, chest pain, and fibromyalgia as severe impairments.  (R. 35).  Because her reports of difficulty with memory, finding words, and completing sentences were not substantiated and, in fact, were contradicted by clinical evidence, he found that her alleged cognitive problems were not severe.  (R. 33).

At step three, he found that Ms. Grant's severe and non-severe impairments did not meet or equal, singly or in combination, any of the Listings of Impairments.

For his steps four and five findings, the ALJ first had to determine Ms. Grant's residual functional capacity ("RFC").  He determined that, while she has severe bipolar and anxiety disorders, they result in only mild restrictions of her activities of daily living, with no limitation

13

in concentration, persistence, or pace, and only moderately limited ability to maintain social functioning.  (R. 34).  He did not find the reports of her subjective symptoms to be credible to a disabling extent.  (R. 34-35).  The ALJ concluded that Ms. Grant retained the RFC for sedentary work with the following work criteria:

- ! able to sit for at least six hours of an eight-hour workday.
- ! able to stand and walk for two hours during an eight-hour workday.
- ! able to lift an carry up to ten pounds frequently and lighter amounts occasionally.
- ! restricted to no more than occasional bending, squatting, kneeling, stopping, and crawling.
- ! allowed to use oxygen throughout the day.
- ! restricted to no exposure to open flames or spark producers.
- ! restricted to an environment relatively free of noxious fumes, gases, and respiratory irritants.
- ! must be allowed to take off one day each month.
- ! restricted to no more than superficial interaction with the general public, co-workers, and supervisors.

(R. 35).  The ALJ found that the opinion of Dr. Stump, the testifying medical expert, was the most probative opinion in the Record that Ms. Grant was capable of sedentary work.  (*Id*.)

At step four, the ALJ found that Ms. Grant's RFC for sedentary work, together with her additional restrictions, allowed her to perform her past relevant work as a journalist by the date she was last insured.  Therefore, he found that she was not disabled.

As an alternate ruling, the ALJ proceeded to step five.  Because he found that Ms. Grant's additional exertional and non-exertional limitations prevented her performance of the full range of work at the sedentary level, he was unable to employ the grids to determine disability.  He relied on the vocational expert's testimony that Ms. Grant's education allowed for direct entry into skilled work and that the skills she acquired from her work experience were transferable to other jobs.  The ALJ concluded that, based on the vocational expert's testimony

that 34,440 jobs exist in Indiana that match Ms. Grant's RFC and vocational profile, she was not

disabled by her date last insured.

**Discussion.**

    **1. Past relevant work.** Ms. Grant contends that the ALJ erred in his step-four finding

that she could perform her past relevant work because it directly conflicts with the vocational

expert's testimony that she had no qualified past relevant work. The SSA has defined a

claimant's past relevant work as "work that you have done within the past 15 years, that was

substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. §

404.1560(b)(1). See also 20 C.F.R. § 404.1565(b) ("past 15 years", "last 15 years"), and Social

Security Ruling 82-62 ("work performed 15 years or more prior to the time of adjudication of the

claim (or 15 years or more prior to the date the title II disability insured status requirement was

last met, if earlier) is ordinarily not considered relevant").

    Ms. Grant does not dispute that her last full-time job, as a news editor and journalist,

which qualified as SGA, did not end until August 1990, (R. 105), or that her insured status

expired on March 31, 2005, (R. 24, 58). Therefore, the fifteen-year window for eligible past

relevant work that closed when her insured status expired, opened on March 31, 1990, which

was at least four months before the end of her last job, thus qualifying that job as past relevant

work. In her opening brief, Ms. Grant argues only that the work she performed from mid-or-late

2003 through early 2004, writing one or two columns a week for an Illinois newspaper, was not

SGA because it was too brief, sporadic, and earned too little money; she did not address her

news-editor job ending in August 1990. But the ALJ relied on her 1990 news-editor/reporter job

as her past relevant work, not her 2003-04 columnist work.

In her reply brief, Ms. Grant for the first time addresses her 1990 job and argues that it does not qualify as past relevant work; however, she employs a strained interpretation of the relevant authorities. She contends that the phrase "15 years or more" in 20 C.F.R. § 404.1565(a) and S.S.R. 82-62 to define the period of relevant work means that the fifteenth year is not counted. She rephrases for clarity: "Thus, under SSR 82-62, work performed within the last 15 years (or 15 years prior to the DLI [date last insured]) does not include the 15th year. Therefore, anything [Ms. Grant] did prior to March 1991 was '15 years or more' before her DLI." (Reply Brief (doc. 31) at 5). She seems to acknowledge that § 404.1560(b)(1)'s language of "within the past 15 years" is inconsistent with her interpretation of § 404.1565 and SSR 82-62, but argues that, for that reason, it must be interpreted consistently in order to avoid the direct conflict. She presents no judicial or administrative authorities supporting her interpretation.

20 C.F.R. § 1560(b)(1) defines past relevant work as "work that you have done within the past 15 years." 20 C.F.R. § 404.1565(a) provides:

> We consider that your work experience applies when it was done *within the last 15 years* . . . . We do not usually consider that work you did *15 years or more before* the time we are deciding whether you are disabled (or when the disability insured status requirement was last met, if earlier) applies. A gradual change occurs in most jobs so that *after 15 years* it is no longer realistic to expect that skills and abilities acquired in a job done then continue to apply.

(Emphases added). S.S.R. 82-62 uses the phrase "15 years or more prior" as a synonym of § 404.1565(a)'s "within the last 15 years" language and repeatedly uses the shorthand "the 15-year period" later in the Ruling. The only reasonable interpretation of these sources is that they define an absolute period of time, a window of fifteen years; they do not describe year-long

blocks of time as separate countable units such that the fifteenth block of time — the fifteenth

year — is excluded.  Such an interpretation does not comport with common usage and no

administrative reason for a specialized usage was shown.  Therefore, we reject Ms. Grant's

argument and conclude that Ms. Grant's relevant work was any work that she performed within

the period ending when her insured status expired and beginning fifteen years before, in other

words, between March 31, 1990 and April 1, 2005.  Because there is no dispute that her last

SGA job ended in August 1990, she had past relevant work that the ALJ was entitled to consider

in his step-four analysis.

**2. Dr. Neville's limitations.**  Ms. Grant argues that, after crediting state-agency

psychologist Dr. Neville's opinion on her mental impairments, the ALJ disregarded, without

explanation, the functional limitations that he found resulted from those impairments, limitations

that could have significantly affected her ability to work at even unskilled sedentary jobs.

> The ALJ wrote about Dr. Neville's opinion:
>
> This opinion is well-grounded in the objective medical evidence and consistent
> with the claimant's actual level of functioning as evidenced by her activities of
> daily living.  It is, therefore, highly probative of the claimant's residual functional
> capacity and entitled to considerable weight.

(R. 33).  Ms. Grant focuses on these last two sentences of Dr. Neville's narrative explanation of

his findings that he recorded in his MRFC form (quoted in full above):  "She does have problems

socially, yet she can complete short, simple, repetitive tasks.  She will work better in an isolated

work environment, but she can function in public."  (R. 192).  The ALJ did not comment on, or

mention, these sentences.

Ms. Grant argues that these sentences mean that Dr. Neville found she "was *limited to* simple, repetitive tasks *unless* she worked in an isolated work environment." (Plaintiff's Brief at 17 (emphases added)). Because the ALJ did not limit Ms. Grant to an isolated work environment, but found that she could have superficial interactions with the public, coworkers, and supervisors, she contends that he should have limited her RFC to the performance of short, simple, repetitive tasks, which would have significantly limited the number of sedentary jobs available to her. (*Id.*)

Whatever Dr. Neville might have meant by these last two sentences as far as Ms. Grant's functional limitations, Ms. Grant's interpretation of the text goes too far. Dr. Neville's report does not say that Ms. Grant was "limited" to short, simple, repetitive tasks; it states only that she was *capable* of completing such tasks, as we imagine most non-disabled claimants are. And there is no warrant in the language for Ms. Grant's interpretation that there is a conditional relationship between the two sentences, *i.e.* that, outside an isolated work environment, Ms. Grant has the capacity for only short, simple, and repetitive tasks; Dr. Neville wrote only that she would work better in such a low-stress environment, as we imagine most workers would. As noted above, in his check-box ratings of Ms. Grant's functional abilities in this same MRFC form, Dr. Neville found no significant limitations in sixteen of the twenty functional activities and found her only moderately limited in the other four activities. (R. 190-91). Similarly, in the PRT form that he completed the same day, he rated her degree of limitation resulting from her bipolar and anxiety disorders as "none" in two of the four functional categories and only "moderate" in a third (he did not rate the fourth category). (R. 204). These check-box ratings indicate a finding that Ms. Grant is not limited to a disabling degree as a result of her mental

18

impairments.

On the other hand, there is a definite and material disconnect between those check-box ratings and Dr. Neville's narrative explanation of them because, whatever Dr. Neville meant by his narrative explanation, particularly the last two sentences, they strongly suggest significantly more severe limitations than indicated by his check-box ratings and limitations that could change the disability determination.  Opining that Ms. Grant can complete short, simple, repetitive tasks and that she would work better in an isolated environment are simply not the types of explanations or elaborations of a relatively limitation-free assessment that one would reasonably expect.  Because the MRFC narrative section is intended to be an elaboration and explanation of the check-box ratings, (R. 192), this inconsistency and uncertainty is significant and should have been explored and clarified by the ALJ.

The Commissioner argues that, even if severe limitations are indicated by the last two sentences of Dr. Neville's MRFC explanation, the ALJ reasonably rejected them and that rejection is supported by substantial evidence which he cites in the Record.  The problem with this argument is that the ALJ's decision contains no sign that he actually considered and rejected any severe limitations indicated by Dr. Neville's explanation in reliance on the evidence cited by the Commissioner, or that he otherwise resolved the apparent inconsistency in Dr. Neville's report.  On the contrary, the ALJ strongly endorsed Dr. Neville's opinion, without distinction in its parts, and described it as showing no disabling limitations.  But the potential inconsistency in his opinion is so apparent and potentially significant that, after giving the opinion such weight, the ALJ had an affirmative duty to seek clarification of it and should not have rejected it silently

19

and without explanation.  Although the Commissioner contends that the ALJ must have rejected this part of Dr. Neville's opinion, with good reason in the Record, it is the *ALJ*'s findings and *his* reasons that we review, not the findings and reasons advanced by Commissioner after-the-fact to support the ALJ's ultimate disability decision. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.  2002).

Although the ALJ thought that Dr. Neville's opinion was highly probative on Ms. Grant's RFC and gave it considerable weight, substantial evidence does not support his reliance thereon or his ultimate disability decision because of the opinion's inherent uncertainty, potential inconsistency, and materiality to the disability determination.

**3.  Dr. Stump's limitations.**  The ALJ also highly credited the opinion of Dr. Stump, the testifying medical expert, describing it as "the most probative opinion of record and indicates that the claimant remains capable of performing sedentary work."  (R. 35).  Ms. Grant argues that the ALJ erred by ignoring, without comment, Dr. Stump's bending, crawling, kneeling, and bending-over limitations.

At the hearing, Dr. Stump testified that Ms. Grant was restricted to the sedentary level of work due to her COPD and obesity.  (R. 803).  The ALJ assumed that Dr. Stump did not mean that she could perform the full range of sedentary work and asked what additional limitations he would place on her performance of sedentary work.  Dr. Stump responded:  "I've noticed with — that these people cannot do bending, crawling, kneeling —  *  *  *  — things like that.  But anything that has to do with bending over makes shortness of breath worse."  (R. 804).  The ALJ did not inquire further.  Soon thereafter, however, when posing his hypotheticals to the

20

vocational expert, the ALJ included a limitation of only "no more than occasional bending,

squatting, kneeling, stooping, and crawling." (R. 807).

In addition to the above endorsement of Dr. Stump's credibility cited by Ms. Grant, the

ALJ wrote:

> Dr. Stump's opinion is based on a comprehensive and relatively recent review of
> all of the relevant medical evidence. It has a close correspondence therewith. Dr.
> Stump's opinion has the best foundation of any medical opinion of record. It is
> the best medical opinion of record for these reasons, is entitled to significant
> weight and outweighs all other medical opinions of record.

(R. 29). The ALJ's only mention of Dr. Stump's postural limitations in his decision is the one

sentence: "Dr. Stump indicated that the claimant has reduced abilities to bend and crawl,

explaining that such activities make breathing more difficult for the claimant." (R. 29).

Nowhere does the ALJ explain the basis for his finding that Ms. Grant is limited to "no more

than occasional" bending and other postures. For aught that appears, the ALJ either ignored or

did not recognize the inconsistency of his "no more than occasional" limitations with Dr.

Stump's total-inability limitations. At the very least, the ALJ significantly erred by describing

Dr. Stump's opinion as finding a "reduced" ability to bend and crawl as opposed to his actual

opinion finding that Ms. Grant had *no* ability to bend, crawl, and kneel. Because having no

ability to bend, crawl, or kneel could significantly erode the number of sedentary jobs that Ms.

Grant could perform, the ALJ's mistake was material to his conclusion that she was not disabled.

As with the issue of the ALJ's treatment of Dr. Neville's opinion, the Commissioner

argues that the ALJ "properly chose to reject the ME's no-bending limitation in light of the

record evidence as a whole" and supports such a finding with citations to Record evidence.

(Defendant's Brief at 15-16).  Again, however, it is the ALJ's reasons, not the Commissioner's, that we review and the ALJ did not explicitly reject Dr. Stump's postural-limitations opinion. Moreover, in light of the ALJ's crediting Dr. Stump's opinion as the best medical opinion, having the best evidentiary foundation, entitled to significant weight, and outweighing all other medical opinion, we cannot conclude that he implicitly rejected this portion of Dr. Stump's opinion in favor of the Commissioner's cited evidence of record that the ALJ explicitly found was inferior to and outweighed by Dr. Stump's opinion.  Finally, because the ALJ so highly credited Dr. Stump's opinion which was, as even the Commissioner concedes, inconsistent with other evidence in the Record, and because Dr. Stump's opinion would likely have a significant effect on the disability determination, the ALJ should not have rejected it implicitly and without an explanation of his rationale.

Substantial evidence does not support the ALJ's finding on Ms. Grant's postural limitations or his ultimate disability determination because he either ignored or failed to accurately recognize Dr. Stump's opinion on Ms. Grant's postural limitations.  At the least, after crediting Dr. Stump's opinion as the best evidence of Record, the ALJ failed in his affirmative duty to expressly articulate his analysis of the opinion's finding of severe postural limitations.

**4.  Hypotheticals posed to the vocational expert.**  Ms. Grant's argument that the ALJ's hypotheticals to the vocational expert were incomplete is derivative of her above arguments regarding Drs. Neville's and Stump's opinions.  Because of the errors that we have found in the ALJ's treatment of the doctors' opinions on Ms. Grant's functional limitations, the ALJ's hypotheticals were incomplete and his ultimate disability determination was not supported by

substantial evidence.

**5. Transferability of skills.**  Ms. Grant argues that the ALJ erred in finding that she had transferrable skills that would allow her to directly enter skilled work.  At step five,[7] the ALJ wrote that the testimony of Ms. Archer, the vocational expert, "shows that the claimant's education provides for direct entry into skilled work.  Ms. Archer also indicated that the claimant has acquired work skills that transfer to other occupations."  (R. 36).  Ms. Grant argues that the ALJ erred in finding that her education (a few credits shy of college graduation) provided for direct entry into skilled jobs because her education was too remote in time and there was no evidence of the content of her education and, thus, of the skills that she supposedly acquired. She also contends that the ALJ erred in finding that she developed transferrable skills from her employment because her last full-time job was not within the window of relevant time and her within-window jobs were only part-time, brief, and sporadic.

The ALJ mistakenly described the vocational expert as testifying that Ms. Grant's education gave her transferable skills.  The vocational expert's only testimony regarding acquisition of transferable skills was the following exchange (questions by the ALJ):

> Q  Do we have any — just one moment.  Do you think that the claimant has education or skills that would allow her to directly enter skilled work?
>
> A  Well, Judge, she sometimes does skilled work, even in the — even though it's only part-time.  She's —
>
> Q  Okay.

---

[7] Because transferability of skills is not relevant to the step-four inquiry, this argument relates only to the ALJ's step-five determination.

A  — is sometimes doing skilled work as a journalist.  So I think yes.

(R. 807).[8]  The vocational expert did not testify that Ms. Grant's education gave her any

transferable skills.  She testified in this exchange only that Ms. Grant's skills derived from her

part-time, non-SGA, work in 2003 and 2004.  While this exchange does not support a finding

that Ms. Grant's last full-time job as a news editor gave her transferable skills, and the

vocational expert had assumed, in fact, that her last full-time job fell outside the window of

relevant work, the vocational expert did testify that the news-editor job was skilled work, (R.

807), and we found above that the ALJ was correct in finding that it did qualify as past relevant

work.  Therefore, the ALJ erred in his finding that Ms. Grant had acquired transferable skills

from her education and her erred in not having vocational-expert testimony that Ms. Grant had

acquired transferable skills from her news-editor job.  Because it is unknown how these errors

might have affected the ALJ's finding regarding Ms. Grant's ability to directly enter skilled jobs,

we cannot say that they were immaterial.

The Commissioner argues that the grids render the transferability of skills irrelevant

because of Ms. Grant's age.  However, the grids are not determinative when claimants are not

able to perform the full-range of work at a given RFC level and the ALJ correctly found that Ms.

Grant was so limited.  Rather, as he was required to do, the ALJ consulted a vocational expert

and used the grids only as a framework for his step-five determination.  But because we have

found above that the ALJ's rejection or disregard of Drs. Neville's and Stump's opinions on Ms.

---

[8] This exchange occurred shortly after the vocational expert testified that she did not
believe that Ms. Grant had any past relevant work "[b]ecause of the time," (R. 806), presumably
meaning that her SGA jobs were outside the fifteen-year window for relevant work.

Grant's exertional and non-exertional functional limitations is erroneous, the ALJ's findings based thereon, his hypotheticals to the vocational expert, and the vocational expert's resulting testimony are not supported by substantial evidence.  The ALJ's reconsideration of the medical opinions might materially change the vocational expert's testimony.

## Conclusion.

For the reasons set forth in this Entry, we find and conclude that the ALJ's decision is not supported by substantial evidence and is compromised by legal error.  Ms. Grant's application for disability benefits will be remanded to the Commissioner for reconsideration consistent with the discussion in this Entry and the following instructions:

The ALJ shall obtain clarification of, reconsider, and articulate his re-evaluation of, Dr. Neville's opinion.   Unless Dr. Neville is unavailable, the ALJ may not obtain a different expert's opinion rather than clarify and reconsider Dr. Neville's opinion.

The ALJ shall reconsider, and articulate his analysis of, Dr. Stump's opinion regarding Ms. Grant's ability to bend, crawl, and kneel and perform actions involving bending over.  The ALJ may recall Dr. Stump to clarify his opinion on these limitations and shall permit Ms. Grant's counsel the opportunity to question him.  Unless Dr. Stump is unavailable, the ALJ may not call another medical expert rather than clarifying and reconsidering Dr. Stump's opinion.

The ALJ shall recall the vocational expert, Ms. Archer, and obtain her reconsidered and focused testimony regarding the acquisition and transferability of Ms. Grant's skills and their impact on the number of jobs available to her.  The ALJ shall also pose new hypotheticals to Ms.

Archer that incorporate his reconsidered findings and evaluations of Drs. Neville's and Stump's opinions.

The ALJ shall reconsider, and articulate his reconsideration of, Ms. Grant's application for disability benefits based on the results of the above instructions.

**SO ORDERED**

Date:   03/30/2010

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Marcia J. Cossell
Lee, Cossell, Kuehn & Love, L. L. P.
mcossell@nleelaw.com

Thomas E. Kieper
Assistant United States Attorney
tom.kieper@usdoj.gov